# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

R&M GOVERNMENT SERVICES, INC.,

      Plaintiff,

v.                                    Civ. No. 2:24-524 GJF/JHR

KAMAN AEROSPACE CORP.,

      Defendant.

## MEMORANDUM OPINION AND ORDER ON
## <u>DEFENDANT'S MOTION TO DISMISS</u>

THIS MATTER is before the Court on Kaman Aerospace Corporation's (Kaman's) Motion to Dismiss ("Motion"), which is fully briefed. ECFs 10, 16, 26, 30, 31. The Court heard extensive argument on August 27, 2024. ECF 32. Having thoroughly considered the filings and arguments, the record evidence as to personal jurisdiction, and the relevant law, the Court will grant the Motion in part and deny it in part. Specifically, the Court (1) will DENY the Motion to the extent it seeks dismissal for lack of personal jurisdiction, (2) will DENY the Motion without prejudice as to the potential application of the economic loss rule to R&M's claims that sound in tort, and (3) will GRANT the Motion to dismiss R&M's constructive fraud claim but will permit R&M to amend its complaint to cure its current pleading deficiency.

## I.    BACKGROUND[1]

---

[1] The facts that follow come from R&M's Complaint [ECF 1-1 (Compl.) at 3–38], the 14 exhibits attached to the Complaint [ECF 1-1 at 39–194], the Declaration of Rikiese King attached to Kaman's Motion to Dismiss [ECF 10-1], and the Declaration of Ralph Archetti and its 12 exhibits attached to R&M's response [ECF 16-1]. *See* ECF 32 at 1–2 (counsel for both sides noting no objection to the Court's consideration of these documents); *see also Torres v. Alamo-Rent-A-Car*, No. 1:09-cv-00106-MV-RLP, 2010 WL 11601206, at \*1 (D.N.M. Mar. 23, 2010) (explaining that courts may consider matters outside the pleadings when evaluating personal jurisdiction). For purposes of resolving Kaman's Motion, the Court accepts as true the allegations in the Complaint and the allegations contained in the exhibits to the Complaint. Insofar as the Motion asserts a lack of personal jurisdiction, the Court also accepts as true the allegations contained in Mr. Archetti's declaration. *See Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 964 (10th Cir. 2022).

This case arises from a commercial relationship in which R&M and Kaman collaborated to identify and compete for small business contracts with the federal government. *See* ECF 1-1 (Compl.) ¶ 2. R&M is a New Mexico "qualified small business that primarily serves as a broker and service provider on U.S. Government contracts," whereas Kaman is a "large and sophisticated aerospace manufacturer" incorporated in Delaware and headquartered in Connecticut but maintaining manufacturing facilities in a number of states, including Florida but not New Mexico. *Id*. ¶¶ 1, 13; ECF 10-1 (King Decl.) ¶ 7–8. Kaman is not currently registered to do business in New Mexico, nor was it registered to do business there during the relevant period.[2] King Decl. ¶¶ 13–14. Neither Kaman nor the division[3] of Kaman with which R&M dealt had operations or employees in New Mexico. *Id*. ¶¶ 8–15.

In the summer of 2020, Kaman identified R&M as a potential small-business teaming partner through a third-party vendor. Compl. ¶ 17. In June 2020, Michael Kelly, Kaman's Director of Proposals and Cost Estimating, reached out to R&M in New Mexico and proposed that Kaman and R&M work together to secure federal government contracts reserved for small businesses, for which Kaman would not otherwise qualify. *Id*. ¶ 2. Although R&M had limited manufacturing and assembly experience to offer, it had over ten years of experience contracting with the U.S.

---

[2] Although Mr. Archetti avows that Kaman *is* registered to do business in New Mexico [ECF 16-1 ¶ 4], R&M corrected the record on this issue at oral argument, conceding that Kaman is not so registered [ECF 32 at 12]. Indeed, R&M indicated that it has no reason to question Kaman's representation that it withdrew its business registration with the New Mexico Secretary of State in 2001. *Id*.; *see also* ECF 26 at 2. Regardless of the status of Kaman's business registration, however, R&M maintains that Kaman has in fact done business in New Mexico since the time it withdrew its registration, as demonstrated by the facts of this case. ECF 32 at 12. Nevertheless, for purposes of the present Motion, however, the relevant inquiry is not whether Kaman's conduct constitutes doing business in New Mexico but whether Kaman's contacts with New Mexico are sufficient to give rise to personal jurisdiction.

[3] In his declaration, Mr. King clarifies that Kaman performed all of its work with R&M through one of Kaman's divisions: Kaman Integrated Structures and Metallics ("KISM"), which has no operations centers, no manufacturing facilities, no offices, no agents, no property, and no documents or records in New Mexico. King Decl. ¶¶ 6, 8–11. According to Kaman, KISM also never sent employees to New Mexico in a professional capacity. *Id*. ¶¶ 11–13. The parties generally do not distinguish between Kaman and KISM throughout their briefs and pleadings and primarily reference Kaman, not the specific division with which R&M contracted. The Court follows suit.

Government and providing supply chain solutions. *Id*. ¶¶ 3, 12.

On October 1, 2020, Kelly sent to R&M in New Mexico a proposed Memorandum of Understanding ("MOU"). *Id*. ¶ 20; ECF 16-1 (Archetti Decl.) ¶ 5. Under the MOU, which R&M and Kaman ultimately executed on October 21, 2020,[4] the counterparties agreed to "work together to identify and support different [government contracting] opportunities that [were] of mutual interest to [them]." Compl. ¶ 21; ECF 1-1 (MOU) at 40; Archetti Decl. ¶ 5. The parties envisioned that R&M would serve as the prime contractor on small-business government manufacturing contracts, while Kaman would serve as the primary subcontractor. Compl. ¶ 2; MOU at 40. Pursuant to the MOU, Kaman would provide its "capabilities and expertise in the areas of aerospace" manufacturing, and R&M would offer its "proficiency in finding Aerospace Opportunities" and in satisfying "government requirements as they pertain to contracting, compliance, packaging and shipping." MOU at 40.

The MOU identified R&M's primary place of business as Las Cruces, New Mexico, and the Kaman's division's primary place of business as Jacksonville, Florida. MOU at 40. In entering into the MOU, "the parties understood that in the event that R&M successfully bid on government contracts as prime contractor, at least some of the work on those contracts would be performed in R&M's facilities in New Mexico, including administrative, accounting, and other tasks in performance of the government contracts."[5] Compl. ¶ 5; Archetti Decl. ¶ 5.

The MOU incorporated "Kaman Aerospace Corporation's Standard Terms and Conditions of Sale" [*see* MOU at 41, ¶ 5], a document attached neither to R&M's Complaint nor the MOU

---

[4] Although the Complaint alleges that the MOU was executed on October 21, 2020 [Compl. ¶ 20], the MOU itself indicates that it was "entered on the 15th day of October, 2020" [ECF 1-1 at 40]. The precise date in October 2020 on which the MOU was executed is not material to the Court's resolution of the Motion to Dismiss.

[5] R&M clarified at oral argument that, while this understanding was not specifically memorialized in the MOU, it was the parties' "oral understanding" at the time they executed the MOU. ECF 32 at 11.

[*see generally* ECF 1-1]. According to Kaman's General Manager, Rikiese King, Kaman's "Terms and Conditions of Kaman . . . and R&M's [MOU], which are incorporated into and govern the Purchase Orders at issue in this dispute, state that Florida law shall govern any contractual disputes."[6] King Decl. ¶ 16.

Around November 2020, R&M began bidding on government projects to manufacture aircraft parts, including replacement parts for the A-10 aircraft. Compl. ¶ 24. During the bidding process, two then-Kaman employees, John Casey and Andrew Binks, worked extensively with R&M and provided substantial input on R&M's proposals and pricing. *Id*. ¶ 25. Binks, in particular, communicated with R&M through hundreds of emails and numerous virtual meetings for more than a year, helping R&M put together its proposals and providing "substantial input" on a daily basis for R&M's Source Approval Request packets ("SARs"), which Binks "substantially drafted." Compl. ¶ 48; Archetti Decl. ¶ 17.

In the SARs, R&M explained how it had the capabilities and knowledge sufficient to

---

[6] Although the parties' MOU and purchase orders are part of the record considered by the Court in deciding Kaman's Motion to Dismiss, the terms and conditions referenced therein are not. The Court made an informal e-mail request that the parties provide the terms and conditions for its consideration in advance of oral argument. Kaman obliged, though the document it provided in response was unsigned and unauthenticated. The Court permitted simultaneous supplemental briefing related to consideration of the terms and conditions document provided by Kaman. ECF 29. In its supplemental brief, R&M represented that the terms and conditions were not previously provided to R&M and therefore were not effectively incorporated into the MOU or purchase orders. *See* ECFs 30 at 1; 32 at 12–13. At oral argument, R&M conceded that an evidentiary hearing would be necessary before the Court could determine whether the terms and conditions had been effectively incorporated. *See* ECF 32 at 12–13. In the absence of such a hearing, there is a reasonable inference from the face of the MOU and the purchase orders—documents R&M has incorporated into its pleadings—that the parties incorporated Kaman's terms and conditions into their contracts. Although the Court does not consider the contents of the unsigned, unauthenticated terms and conditions document submitted via e-mail, it *does* consider the averments of Mr. King on the matter. According to Mr. King, the applicable terms and conditions included a choice-of-law provision providing that Florida law would govern the parties' contractual disputes. King Decl. ¶ 16. R&M does not point to any evidence to dispute Mr. King's statement to this effect. Significantly, though, even accepting as true for purposes of the personal jurisdiction inquiry the notion that the parties agreed to a Florida-facing choice-of-law provision, the Court cannot say that such a provision would overwhelm the other evidence before it such that the exercise of personal jurisdiction would run afoul of the due process clause. That is, even if the parties agreed that Florida law would govern their contractual disputes, as Mr. King avows, Kaman's contacts with R&M in New Mexico nevertheless rise to the level of "minimum contacts" supporting personal jurisdiction. Accordingly, the Court defers resolution of the evidentiary issues related to incorporation of the choice-of-law provision for another day.

manufacture or assemble a given part. Compl. ¶ 47; Archetti Decl. ¶ 18; *see also* ECF 1-1 at 45–51 (excerpt from SAR packet). Based on Binks's representations, R&M claimed in its SARs that it had the "capability to become a manufacturing firm and a systems integrator for government contracts" and that it would subcontract work, including to Kaman, before assembling final products at R&M's facilities. Compl. ¶ 49–50; Archetti Decl. ¶ 19; ECF 1-1 at 49 (excerpt from SAR packet). The SARs represented that R&M had two facilities: (1) its corporate office located at 650 N. Montana Ave., Las Cruces, New Mexico, where R&M's contract management and administrative duties were completed; and (2) its production and warehouse facility located at 2320 Westgate Ct., Las Cruces, New Mexico, where R&M's machining operations, assembly, part marking, packing, and final inspection took place. ECF 1-1 at 50 (excerpt from SAR packet). The SARs further represented that R&M had a working agreement with Kaman to "learn assembly manufacturing." Compl. ¶ 52–53; Archetti Decl. ¶ 19; ECF 1-1 at 49 (excerpt from SAR packet). In addition to collaborating with R&M on the SARs during the bidding process, Kaman completed a "Vendor Capability Questionnaire," in which it represented that it could manufacture subcomponents called for in the government contracts on which R&M bid. Compl. ¶ 56.

Relying on Kaman's price quotes and its representations that it would handle the engineering, tooling, material purchasing, and subcomponent purchasing/manufacturing, R&M applied for and was awarded seven government contracts for aircraft replacement parts: two contracts with the Defense Logistics Agency ("DLA Contracts") and five contracts with the U.S. Air Force ("Air Force Contracts"). *Id*. ¶¶ 45–58. R&M would not have bid on the DLA Contracts or the Air Force Contracts had it known that Kaman would fail to satisfy its obligations to R&M. *Id*. ¶¶ 59–60.

After securing the DLA Contracts and Air Force Contracts, R&M issued purchase orders

to Kaman for component and subcomponent parts. *Id.* ¶¶ 61, 67–68, 80–81, 92–93, 105–07, 116–17, 132, 137. Of relevance here, R&M issued to Kaman five purchase orders in connection with the Air Force Contracts, including 20803 (for the Shroud Door contract), 20864 (for the Structural Panel contract), 20865 (for the ventral fin contract), 20875 (for the Wing Tip contract), and 20894 (for the Wheel Pod contract). *Id.* ¶ 61. One of these purchase orders, issued on R&M letterhead on December 14, 2022, obligated Kaman, as vendor, to ship the "Feel Mechanism, Rudder Control" to R&M at its 2320 Westgate Court address in Las Cruces, New Mexico, where R&M would "inspect[] for packaging." ECF 1-1 at 85–86.

Sometime after the parties executed the MOU, it became clear that for R&M to be competitive in small business set-aside bids, R&M would need to qualify itself as a manufacturer. Compl. ¶ 27. Because Kaman was aware that R&M had very limited manufacturing and assembly experience, Kaman assured R&M that it would assist R&M in the assembly process, for free, as part of the parties' informal mentor-protégé relationship. *Id.* ¶ 29. Additionally, the parties agreed that it would be mutually beneficial for R&M to rent space in Kaman's Jacksonville facility. *Id.* ¶ 30. Thus, concurrent with the bidding and contract approval process, R&M and Kaman engaged in discussions related to R&M's lease of a portion of Kaman's Jacksonville facility. *See* Archetti Decl. ¶ 12 (highlighting a statement in John Casey's September 28, 2022 Small Business Administration declaration that "Kaman now intends to enter an arms-length, commercially reasonable lease with R&M for a portion of its facility in Jacksonville, Florida"); ¶ 13 (referencing an October 21, 2022 e-mail from Casey to R&M stating that "[a]s discussed, we have been working with our corporate office on requirements to have R&M employees on site"); *see also* Compl. ¶¶ 24–29. In fact, there were dozens, if not hundreds, of communications between R&M and Kaman in 2022 and 2023 related to R&M leasing space in Jacksonville from Kaman. Archetti Decl. ¶ 14.

On September 22, 2022, Binks sent an email to R&M indicating that R&M could "rent some part of [Kaman's Jacksonville] building and be located next to Kaman [to] save money on transporting the sub-assemblies to [R&M] for final [assembly]." *Id.* ¶ 11; ECF 16-1 at 22; *see also* Compl. ¶ 30. And on October 21, 2022, Casey sent an e-mail to R&M, advising that he was "working with [Kaman's] corporate office on requirements to have R&M employes on site." Archetti Decl. ¶ 13; Compl. ¶ 34; ECF 16-1 at 24. Kaman also provided R&M with a draft sublease agreement that included a floor plan entitled "Proposed R&M area in Gun Club" and, in February 2023, invited R&M executives to the Jacksonville facility, showing them a portion of space that had been branded with R&M signage. Compl. ¶¶ 31–33. While the R&M executives were on Kaman's premises in February 2023, Kaman also showed R&M a workspace where an R&M administrative sales employee could potentially work within the Jacksonville facility full-time. Compl. ¶ 34. Moreover, Kaman permitted R&M to list its Jacksonville facility's cage code as the "facility code" on at least three government contracts. *Id.* ¶ 35.

Because Kaman promised that R&M could occupy a portion of Kaman's Jacksonville facility in the fall of 2022, R&M agreed to vacate its facility at 2320 Westgate Court early. Compl. ¶ 37. Despite Kaman's promises to the contrary and despite Kaman knowing that R&M would be without a facility suitable for parts assembly, Kaman ultimately refused to lease any of its Jacksonville facility space to R&M. *Id.* ¶ 40. Without a suitable facility, R&M was out of compliance with the Air Force Contracts. *Id.* ¶ 42.

In addition, R&M alleges that, throughout 2022 and 2023, Kaman falsely represented to R&M on a monthly basis that its progress in satisfying purchase orders was "on track." Compl. ¶¶ 7, 75–77, 86–87, 99–101, 110–12, 121–23, 133; Archetti Decl ¶¶ 31–43. Relatedly, R&M identifies the following misrepresentations by Kaman related to the purchase orders:

7

> Kaman routinely "restructured" the POs to take on less responsibility (and accordingly place more responsibility on R&M); misled R&M about its ability to secure subcontractors; misled R&M about the true progress on projects; failed to do its due diligence before entering into the POs; attempted to subcontract work out to its own non-small subsidiary; and misled R&M about providing assembly "know-how" free of charge.

Compl. ¶ 144. R&M alleges that Kaman's misrepresentations had "devasting consequences for R&M." *Id*. Kaman ultimately never supplied any of the component or subcomponent parts identified in the purchase orders. *Id*. ¶¶ 78, 90, 103, 113, 124, 134–36, 140–42. On October 17, 2023, the Air Force cancelled its contracts with R&M for default because (1) R&M did not have access to a manufacturing facility during the contract period; (2) R&M failed to deliver components called for by the Air Force Contracts; and (3) R&M did not qualify as a "small business" due to its relationship and alleged affiliation with Kaman. *Id*. ¶¶ 152–54.

## II.   APPLICABLE LAW

### a.   Personal Jurisdiction

"[A] federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). "[I]n addition to satisfying this state law requirement, the exercise of personal jurisdiction must not offend the due process clause of the Fourteenth Amendment." *United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (quotation omitted). But "[b]ecause New Mexico's long-arm statute has been interpreted to extend 'as far as constitutionally permissible,'" *Good v. Fuji Fire & Marine Ins. Co.*, 271 F. App'x 756, 759 (10th Cir. 2008) (unpublished) (quoting *Tercero v. Roman Catholic Diocese*, 132 N.M. 312, 316 (N.M. 2002)), the personal jurisdiction analysis "collapses into a single due process analysis under the Constitution." *Botefuhr*, 309 F.3d at 1271 (quotation omitted).

8

1.  <u>Minimum Contacts</u>

"Consistent with due process, a court may exercise specific personal jurisdiction over a non-resident defendant only when that defendant has the requisite 'minimum contacts' with the forum state, such that having to defend the lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[7] "[T]he Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' [a] defendant's forum-related activities." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Although the "purposefully directed" analysis "can appear in different guises," "[i]n all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King*, 471 U.S. at 475) (observing that courts sometimes ask "whether the nonresident defendant 'purposefully directed' its activities at the forum state" or "'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state"). With respect to the second prong of the minimum contacts analysis, "[t]he import of the 'arising out of' analysis is whether the plaintiff can establish that the claimed injury resulted from the defendant's forum-

---

[7] Because the Court concludes that it has *specific* jurisdiction over Kaman here, it need not address whether it also might have *general* jurisdiction over it. *Eighteen Seventy*, 32 F.4th at 965 n.8 (emphasis added) (observing that "the relevant inquiry in [the general jurisdiction] context is whether a defendant was 'essentially at home' in a forum state" (quotation omitted)). In that regard, R&M concedes that *general* personal jurisdiction does not lie over Kaman in New Mexico. ECF 32 at 11.

related activities." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (quotation omitted).

### 2.   Fair Play and Substantial Justice

"If the defendant's actions create sufficient minimum contacts, [the court] must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *Eighteen Seventy*, 32 F.4th at 966. Courts consider five factors: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1227 (10th Cir. 2021) (quotations omitted). To be sure, "instances where the exercise of personal jurisdiction offends fair play and substantial justice are rare." *Compañía de Inversiones Mercantiles, S.A.*, 970 F.3d at 1289 (quotation omitted); *see also Hood*, 21 F.4th at 1227 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that . . . other considerations would render jurisdiction unreasonable." (quoting *Burger King*, 471 U.S. at 477)).

### 3.   Burden Shifting at Pleading Stage

A plaintiff "bear[s] the burden of establishing personal jurisdiction." *Eighteen Seventy*, 32 F.4th at 964. "[A]t this early stage in the litigation, in the absence of an evidentiary hearing, [the plaintiff] need only make a prima facie showing of personal jurisdiction." *Id.* "In other words, the plaintiff may defeat a motion to dismiss by presenting evidence—either uncontested allegations in its complaint or evidence in the form of an affidavit or declaration—that if true would support jurisdiction over the defendant." *Id.* (quotation omitted). "This showing is 'light.'" *Racher v. Lusk*,

674 F. App'x 787, 789 (10th Cir. 2016) (unpublished) (quoting *Wenz v. Memery Crystal*, 55 F.3d

1503, 1505 (10th Cir. 1995)). Furthermore, "[a]ll factual disputes are resolved in favor of the

plaintiff[ ] when determining the sufficiency of this showing." *Rusakiewicz v. Lowe*, 556 F.3d

1095, 1100 (10th Cir. 2009). "Of course, even if personal jurisdiction is contested and found

initially on the pleadings and by affidavit, it may be reviewed again at subsequent stages in the

trial court proceedings as evidence accumulates." *Dudnikov*, 514 F.3d at 1069–70 n.3; *see also*

*FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992) (observing that "whatever

degree of proof is required initially, a plaintiff must have proved by the end of trial the

jurisdictional facts by a preponderance of the evidence" (quotation omitted)).[8]

If the plaintiff establishes that the out-of-state defendant had minimum contacts with the

forum, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction over

it in the forum would nevertheless be improper. To do so, the defendant must present a "compelling

case" that, in light of other considerations and applying the applicable factors, exercising personal

jurisdiction "would offend traditional notions of fair play and substantial justice." *Old Republic*

*Insur. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 908 (10th Cir. 2017).

### b.  Failure to State a Claim

A Rule 12(b)(6) motion prompts a court to "assess whether the plaintiff's complaint alone

is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*,

336 F.3d 1194, 1201 (10th Cir. 2003). When ruling on such a motion, a court accepts "all well-

pleaded factual allegations in the complaint" and construes them "in the light most favorable" to

the plaintiff. *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1305 (10th Cir. 2020).

---

[8] The Court finds that, at this early stage in the proceedings an evidentiary hearing is not necessary to resolve the Motion. *See*, *e.g.*, *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1140 (10th Cir. 2009) (noting that "district courts generally have broad discretion to manage their dockets" (quotation omitted)).

However, a court need not accept "a legal conclusion couched as a factual allegation." *Bell Atl.*
*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the plaintiff must
put forth facts stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009). While plausibility is not the same as probability, it is more than a "sheer
possibility." *Id.*

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for claims
involving fraud. "In alleging fraud or mistake, a party must state with particularity the
circumstances constituting fraud or mistake[,]" but states of mind such as knowledge or malice
may be pled generally. Fed. R. Civ. P. 9(b). A plaintiff must "set forth the time, place and contents
of the false representation, the identity of the party making the false statements and the
consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citation
omitted).

Courts should be hesitant to dismiss a claim with prejudice under Rule 12(b)(6) and should
instead err on the side of allowing a plaintiff to amend. *Seale v. Peacock*, 32 F.4th 1011, 1029
(10th Cir. 2022). But a court should dismiss a claim with prejudice when it finds that it would be
futile to allow the plaintiff to amend that claim. *Id.* at 1027.

## III.   PARTIES' PRIMARY ARGUMENTS

### a.  Kaman's Contentions

To begin, Kaman asserts that R&M cannot establish specific personal jurisdiction over it
in New Mexico, as merely contracting with a New Mexico company is insufficient to subject an
out-of-state defendant to personal jurisdiction in New Mexico. ECF 10 at 11–13. According to
Kaman, the contacts R&M identifies as New Mexico contacts do not rise to the level of "minimum
contacts" because they are either "factually incorrect, . . . legally irrelevant, [or] significantly

overstated." ECF 26 at 1. Kaman maintains that, even taking R&M's allegations as true, there is no indication that Kaman purposefully directed its activities toward New Mexico, particularly where its communications with R&M occurred by e-mail, over the phone, and through virtual meetings. *Id*. at 3–5. Rather, Kaman insists that Florida, rather than New Mexico, is the "focal point" of R&M's claims for purposes of personal jurisdiction. *Id*. at 7. Finally, Kaman asserts that the exercise of personal jurisdiction over it in New Mexico would "offend traditional notions of fair play and substantial justice," given the substantial burden on Kaman to defend an action in a state where it has no property or offices and in which the majority of the acts giving rise to R&M's claims did not occur. ECFs 10 at 13–16; 26 at 7–9.

As to R&M's negligent misrepresentation and constructive fraud claims, Kaman asserts that New Mexico's economic loss rule operates to bar those claims. ECFs 10 at 16–19; 26 at 9–11. Because R&M seeks recovery for economic damages, Kaman suggests that R&M must pursue its claims under a breach of contract theory if at all. ECF 10 at 18–19.

Finally, Kaman argues that R&M has failed to plead its constructive fraud claim with sufficient particularity to satisfy the heightened standard imposed by Federal Rule of Civil Procedure 9(b). ECFs 10 at 20–26; 26 at 11–12. Accordingly, Kaman urges the Court to dismiss that claim for failure to state a claim. ECFs 10 at 26; 26 at 12.

### b.  R&M's Contentions

R&M insists that specific personal jurisdiction exists over Kaman here. ECF 16 at 11. In R&M's view, Kaman purposefully availed itself of New Mexico by soliciting and entering into a long-running, commercial relationship with a New Mexico company, with the understanding that part of the work contemplated by the parties to that relationship would occur in New Mexico. *Id*. at 12–15. R&M alleges that personal jurisdiction is further supported by near-daily

communications between Kaman and R&M during the relevant period as well as by misrepresentations made by Kaman that R&M received in New Mexico. *Id*. In addition, R&M maintains that Kaman has not shown that the exercise of personal jurisdiction over Kaman in New Mexico is unreasonable under the circumstances. *Id*. at 15–18.

Observing that New Mexico courts have not applied the economic loss rule outside the strict products liability context, R&M asserts that the rule does not bar the tort claims here. *Id*. at 18–19. Even if the rule extended to other contexts, R&M insists that it would not bar the tort claims here, which stem from Kaman's misrepresentations rather than from specific contractual provisions. *Id*. at 19–21.

Finally, R&M suggests that Kaman has misapplied Federal Rule of Civil Procedure 9(b) to its constructive fraud claim. *Id*. at 22. R&M observes that Rule 9(b) does not necessitate verbatim transcriptions of every plausible fraudulent statement but merely requires that the allegations put the defendant on notice of the misrepresentations alleged. *Id*. R&M insists that its constructive fraud claim here provides such notice to Kaman. *Id*. at 22–24.

## IV.   ANALYSIS

### a.  Personal Jurisdiction

#### i.   <u>Minimum Contacts</u>

The Tenth Circuit has used three different frameworks for determining whether an out-of-state defendant's activities satisfy the "purposeful direction" element of the "minimum contacts analysis. *See Old Republic Insur. Co*., 877 F.3d at 905 (discussing the "continuing relationships," "market exploitation," and "harmful effects" frameworks). This circuit tends to apply the "continuing relationships" framework to cases involving "contractual contacts," the "market exploitation" framework to cases alleging a deliberate exploitation of the forum state's market,

and the "harmful effects" framework to cases involving torts. *See id.; see also Dental Dynamics, LLC v. Jolly Dental Group, LLC*, 946 F.3d 1223, 1230 (10th Cir. 2020) (applying the "continuing relationships" framework to the plaintiff's breach of contract claim and the "harmful effects" framework to the "tort-based claims"). But here, there is no clear consensus as to whether this is a case about "contractual contacts" or a case about torts. Kaman suggests that the "Complaint describes the breakdown of a contractual relationship" [ECF 10 at 1], whereas R&M maintains that the parties' "contractual relationship is tangential" to its tort claims [ECF 16 at 1]. As framed by the Complaint, the parties' relationship seemed to have involved *both* tortious conduct and contract-related contacts. Likewise, R&M's claims themselves sound in tort as well as contract. *See* ECFs 16 at 1 (R&M explaining that its good faith and fair dealing claim is the "lone exception" to the notion that parties' "'contractual' relationship is tangential to the claims"); 32 at 2 (counsel for Kaman describing R&M's good faith and fair dealing claim as a contract claim). Because the jurisdictional inquiry here is suited both to the "continuing relationships" framework and the "harmful effects" framework, the Court applies both in turn.

Under the "continuing relationships" framework, the Court considers "the out-of-state defendant's 'continuing relationships and obligations with citizens of the forum state.'" *Old Republic Ins. Co.*, 877 F.3d at 905 (quoting *Burger King*, 471 U.S. at 473). The Supreme Court has found purposeful availment under this framework when the defendant "purposefully 'reach[ed] out beyond' their State and into another by . . . entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Walden*, 571 U.S. at 285 (quoting *Burger King*, 471 U.S. at 479–80).

Kaman is quick to point out that simply contracting with a New Mexico company, without more, is insufficient to confer personal jurisdiction in New Mexico. While the Court does not

quarrel with that basic premise, a contract with a forum resident nonetheless remains part of the purposeful direction calculus. *See Old Republic Insur. Co*., 877 F.3d at 905. In addition to considering the contract itself, the Court must assess the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id*. As explained below, Kaman's contacts with New Mexico went well beyond merely entering into a contract with a New Mexico company.

In the category of prior negotiations, the Court observes that Kaman reached out to R&M in New Mexico,[9] to propose that the two parties work together to secure contracts set aside by the federal government for small businesses. The commercial relationship that Kaman solicited and that the parties contemplated was an ongoing, long-running one that would entail frequent communication between the companies as well as sending both information and component parts from Kaman in Florida to R&M in New Mexico.

The parties went on to execute the MOU that Kaman proposed—R&M from New Mexico and Kaman from Florida—and thereby commenced a business relationship for an indefinite period. Incorporated into the MOU was a provision indicating that any contractual disputes would be resolved under Florida law but which apparently said nothing of the forum in which those disputes would be resolved. *See* ECF 32 at 8 (discussing the absence of a forum selection clause).

As it turned out, the parties' relationship lasted nearly four years and spawned hundreds, if not thousands, of communications between the parties via phone and email as well as dozens of virtual meetings. Some of those communications gave rise to R&M's claims that it suffered harm

---

[9] Kaman emphasizes that R&M has not alleged that Kaman knew R&M was in New Mexico at the time of its initial contact. ECF 32 at 2. While it is possible that Kaman may not have known R&M's geographical location on initial contact, that lack of knowledge is not dispositive of the jurisdictional analysis, particularly where the Court can infer that Kaman knew when the parties executed the MOU—only a few, short months later—that R&M was located in New Mexico. *See* MOU ¶ 40 (identifying R&M's primary place of business as Las Cruces, New Mexico).

in New Mexico because Kaman directed misrepresentations to it there. In terms of in-person meetings, R&M executives traveled to Florida for in-person meetings on at least one occasion. Kaman's employees, however, never traveled to New Mexico.

During the course of their relationship, the parties collaborated in the bidding process, with Kaman providing significant input through daily communications for more than a year and "substantially drafting" the SARs that R&M provided to its government customers. According to those SARs, the parties contemplated that some work called for in the government contracts would be performed by Kaman in Florida, with follow-on work performed by R&M in New Mexico before the product was shipped to the government customer. In other words, the parties envisioned a Florida phase and a New Mexico phase to their coordinated work under the government contracts and in furtherance of their shared objectives. Consistent with that understanding, one of the purchase orders R&M issued to Kaman expressly provided that Kaman would send components to R&M at its New Mexico address for follow-on work by R&M.  When the parties came to believe, sometime after executing the MOU, that R&M would need to qualify as a manufacturer to be more competitive in bidding for government contracts, they engaged in extensive discussions about the possibility of R&M leasing a portion of Kaman's facility in Florida. The contemplated lease never came to fruition, however, and R&M remained in New Mexico for the duration of the parties' relationship.

Kaman relies upon three cases—one Tenth Circuit case and two reported cases from the District of New Mexico—in support of its position that entering into a contract with a New Mexico company does not subject it to personal jurisdiction in New Mexico. ECF 10 at 13 (citing *Old Republic Ins. Co.*, 877 F.3d at 917; *Watkins v. Fed. Ins. Co.*, 670 F. Supp. 3d 1244, 1249 (D.N.M. 2023); *Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist.*,

193 F. Supp. 3d 1200 (D.N.M. 2016)). None of these cases involved contractual contacts or a level of collaboration approaching the parties' commercial relationship here.[10] *See* ECF 32 at 7 (Kaman conceding that the cases it cited involved less extensive contractual relationships). Nor did the contracting parties in the cited cases contemplate that the out-of-state defendant would send physical products to the plaintiff in the forum state. *See id*. at 7–8 (Kaman conceding that none of the contracts in the cited cases featured such a requirement).

Of the cases cited, *Resource Associates* comes the closest to the frequency and duration of contractual contacts here. There, during the course of the parties' eight-month commercial relationship, they communicated by phone and e-mail back and forth from New Mexico, where the plaintiff-company was located, and New York, where the school district was located. *See Res. Assocs*., 193 F. Supp. 3d at 1208–09. The parties engaged in pre-contractual negotiations, and they ultimately entered into a written contract, pursuant to which the New Mexico company provided

---

[10] *Old Republic Insurance Co*. was a subrogation strict liability action arising from an airplane crash. 877 F.3d at 900. The defendant there ran a website from which airplane repair businesses, or "fixed-base operators" (FBOs), could pay annual fees to access online service manuals. *Id*. at 900–02. A Colorado-based FBO accessed the defendant's online manuals to service a plane, and after that plane crashed, the airplane's insurer argued that the service manuals contained defective information that caused the crash. *Id*. The Tenth Circuit found no "minimum contacts" by the defendant with Colorado, as its only relevant Colorado contacts related to the Colorado FBO's participation in the FBO Program through the defendant's website. *Id*. at 909–14. The commercial relationship in *Old Republic* is easily distinguishable from the one here. There were no prior negotiations, and the parties' agreement was for one year, with minimal obligations. *Id*. at 910–12. Apart from an e-mail notification asking the Colorado FBO to activate its online account, there were no direct communications between the defendant and the Colorado FBO. *Id*. at 912–13. Relatedly, the defendant did not reach out to the Colorado FBO; it simply published its website, which could be accessed from anywhere in the world, including Colorado. *Id*. at 914. And although the parties' contract contemplated the potential for future exchanges between the parties, those exchanges apparently did not occur. *Id*. at 912–13.

*Watkins* is quite dissimilar from the instant case. There, an employee (a Texas resident) sued his employer's auto insurer after he was involved in an accident while driving to New Mexico for work. 670 F. Supp. 3d at 1247. Judge Robbenhaar determined the defendant insurer did not have sufficient contacts with New Mexico for the Court to exercise specific personal jurisdiction over it. *Id*. at 1250–53. Notably, the insurer defendant had no offices or employees in New Mexico and had no direct involvement with its insured's business or the plaintiff's travel to New Mexico. *Id*. at 1250–51. At most, the defendant marketed its insurance products nationally and those products could have reached individuals in New Mexico. *Id*. at 1251–52. But the policy in question was issued to a *Texas* company with a *Texas* uninsured/underinsured motorist provision, and none of the communications regarding the claim occurred in or were directed to New Mexico. *Id*. at 1252.

the New York school district with grant-writing services. *Id*. at 1210. Yet, there was a significant distinguishing feature of the contracting parties' relationship in *Resource Associates*: it was the New Mexico plaintiff, not the out-of-state defendant, that initiated the commercial relationship by sending an advertisement to the defendant in New York. *Id*. at 1243 (reasoning that it was a factor weighing against specific personal jurisdiction that the New York school district did not initiate contact with the New Mexico company). Moreover, the purpose of the parties' collaboration was to produce a grant application not for some customer in yet another state, but for the Education Department in New York. *Id*. (reasoning that another factor weighing against specific personal jurisdiction was that the grant application was to be provided to the New York Education Department). Given these significant differences and the shorter duration of the parties' relationship, the Court does not consider *Resource Associates* to be sufficiently analogous so as to undermine the existence of personal jurisdiction over Kaman here.

For its part, Kaman suggests that initiation of contact with the forum plaintiff is of little consequence to the jurisdictional analysis here for two mitigating reasons: (1) R&M has not alleged that Kaman knew it was reaching into New Mexico when it reached out by e-mail; and (2) the parties were connected by a third party for reasons that had nothing to do with New Mexico. ECF 32 at 3. As to the first factor, it is true that R&M has not specifically alleged, through the Complaint or declaration, that Kaman knew R&M was located in New Mexico when Kaman sent its first e-mail to R&M in June of 2020. Conversely, R&M did not allege that Kaman was *unaware* of R&M's geographic location at the time of that initial e-mail. Kaman further suggests that, because e-mail is divorced from geographical markers, an e-mail without any corresponding indication that the sender knew where the e-mail would be received does not demonstrate purposeful availment of the recipient's forum. ECF 29 at 3 (citing *Shrader v. Biddinger*, 633 F.3d

1235, 1248 (10th Cir. 2011)); *see also* ECF 32 at 2.

The Court generally agrees with the notion that an e-mail itself, absent the sender's knowledge of where the recipient was located, does not demonstrate purposeful direction. *See Shrader*, 633 F.3d at 1248. Notably, the Tenth Circuit recently clarified that an out-of-state defendant who sends e-mails with *constructive* knowledge (*i.e.*, stored physical address information) of the recipient's location, *does* demonstrate purposeful direction at the recipient's forum state. *XMission, LC v. Purehealth Research*, 105 F.4th 1300 (10th Cir. 2024). Thus, if the third-party vendor who connected Kaman with R&M provided R&M's New Mexico address or location to Kaman, then Kaman presumably would have had constructive knowledge of R&M's New Mexico location, and Kaman's e-mail would constitute purposeful direction at New Mexico. But even without any factual allegations to that effect, the Court is satisfied that Kaman was aware of R&M's location at least by October 1, 2020. After all, it was on that date that Kaman sent to R&M the proposed MOU, which identified R&M's principal place of business as Las Cruces, New Mexico. At minimum, the October 1, 2020 contact that Kaman initiated with R&M weighs strongly in favor of a finding that Kaman purposefully directed contacts at New Mexico.

The Court is similarly unpersuaded by Kaman's second mitigating factor. Kaman makes much of the fact that it reached out to R&M because of its potential as a suitable teaming partner on small business government contracts, not *because R&M was based in New Mexico*. Given that R&M does not allege that Kaman was specifically searching for a New Mexico-based partner or otherwise motivated by R&M's New Mexico location, Kaman suggests that this diminishes its own connection with New Mexico for jurisdictional purposes. But Kaman interprets the purposeful availment standard too narrowly. To exercise personal jurisdiction over a defendant, courts have not required that the defendant direct its activity at the forum resident state *because of* that

plaintiff's connection with the forum state. Rather, they have considered whether the defendant purposefully directed its activities at the plaintiff in the forum state. *See, e.g., Benton v. Cameco Corp.*, 375 F.3d 1070, 1078 (10th Cir. 2004) (explaining that when the defendant negotiated and entered into an MOU, it "voluntarily and knowingly entered into a relationship with a Colorado resident" and, thereby "purposefully directed [its] activities at residents of the forum"). The Court makes the reasonable inference that when Kaman sent the proposed MOU to R&M in New Mexico approximately four months after its initial e-mail contact, Kaman was aiming to collaborate with a *specific* New Mexico-based partner. This is enough to demonstrate purposeful direction. Consequently, the fact that Kaman reached out to a New Mexico-based company to solicit participation in an ongoing commercial relationship *is* a fact of significant consequence to the jurisdictional analysis.

In the Court's view, only two facts cut against a finding of purposeful direction, and each only slightly: (1) the parties' MOU and purchase orders incorporated a Florida choice-of-law provision and (2) none of Kaman's employees visited R&M in New Mexico for in-person meetings. Still, when considered in the aggregate, the pertinent allegations related to the parties' commercial relationship weigh strongly in favor of finding purposeful direction by Kaman with New Mexico. Indeed, the sheer volume of Kaman's communications with R&M in New Mexico over a nearly-four-year period, together with Kaman's initiation of and solicitation of the parties' commercial relationship, suggests that Kaman purposefully directed its activities at New Mexico. The parties' initial understanding that Kaman would send to New Mexico both information and components in furtherance of the parties' shared objectives and that R&M would perform administrative and accounting tasks related to the government contracts in New Mexico further strengthens R&M's purposeful direction showing.

21

For all these reasons, the Court concludes that R&M has demonstrated that Kaman "envisioned continuing and wide-reaching contacts" with R&M in New Mexico. *See Walden*, 571 U.S. at 285 (quoting *Burger King*, 471 U.S. at 479–80). Under the "continuing relationships" framework, R&M has demonstrated that Kaman purposefully directed its activities at New Mexico. *See Rainbow Travel Serv., Inc. v. Hilton Hotels Corp*., 896 F.2d 1233 (10th Cir. 1990) (concluding that the defendants' course of conduct taken as a whole—including the solicitation of business in Oklahoma and the negotiation, execution, and partial performance of the contract in Oklahoma—demonstrated a purposeful and substantial connection with the state of Oklahoma); *Benton*, 375 F.3d 1070 (concluding that when the out-of-state defendant voluntarily negotiated and entered into an MOU aimed at engaging in future uranium transactions with a Colorado resident, it "purposefully directed" its activities at the Colorado resident such that it should have reasonably anticipated being haled into court there).

Under the "harmful effects" framework, the inquiry before the Court is whether Kaman's intentional conduct targeted and had substantial harmful effects in New Mexico. *Old Republic Ins. Co.*, 877 F.3d at 907. The Tenth Circuit has distilled the harmful effects framework to three elements: (1) an intentional action; (2) expressly aimed at the forum state; and (3) with knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov*, 514 F.3d at 1072. Taking R&M's allegations as true, the Court notes that some of the many post-MOU communications that arose from Kaman's solicitation of an informal partnership with R&M were material misrepresentations made by Kaman to R&M's principals in New Mexico. Specifically, R&M alleges that Kaman made the following material misrepresentations, which induced R&M into bidding on and securing government contracts: (1) that "Kaman had the capacity and desire to manufacture, tool, and purchase subcomponents necessary to ensure that R&M could fulfill prime

contract obligations; (2) that R&M could lease space within Kaman's Jacksonville manufacturing facility; and (3) that Kaman would provide assembly 'know-how' to R&M free of charge." Compl. ¶¶ 4–7. There is no question that R&M alleges intentional action by Kaman in making these representations. Given the timing of these alleged misrepresentations, the Court can infer that they were made with Kaman's knowledge that R&M was a New Mexico company and that the brunt of any injury from such misrepresentations would therefore be felt in New Mexico. In other words, Kaman expressly aimed its alleged misrepresentations at New Mexico. R&M, in turn, received those alleged misrepresentations in New Mexico, relied upon them in performing its own contractual obligations in New Mexico, and ultimately suffered harm in New Mexico.

Despite the alleged transmission of misrepresentations to R&M in New Mexico and the alleged harm suffered by R&M there, Kaman insists that Florida, not New Mexico, is the focal point of R&M's tort claims. That is, because some of the alleged misrepresentations related to Kaman's manufacturing capabilities in Florida and whether Kaman would lease R&M facilities in Florida, Kaman argues that Florida is the appropriate situs for those claims. The Court disagrees. That *some* of Kaman's allegedly tortious conduct may have taken place in Florida or may have related to Florida lease space does not negate the substantial and purposeful contacts that Kaman directed at R&M in New Mexico or Kaman's awareness that the effects resulting therefrom would be suffered in New Mexico. Although R&M does allege that *some* misrepresentations were conveyed to R&M executives while they were visiting Kaman's Jacksonville facility [*see* Compl. ¶¶ 33–34], the majority of the alleged misrepresentations, including those related to R&M leasing space in Florida, were conveyed to R&M in New Mexico. *See* Archetti Decl. ¶ 14 (alleging that there were dozens, if not hundreds, of communications in 2022 and 2023 related to R&M leasing space in Jacksonville, and specifically detailing emails from Kaman to R&M on September 22,

2022, and October 21, 2022). Moreover, *all* of the alleged misrepresentations related to an agreement to be partially performed in New Mexico, and, according to R&M's allegations, all of the misrepresentations caused harm to R&M in New Mexico.

Critically, neither Kaman's communications with R&M in New Mexico nor the effects therefrom can be described as random or incidental. By way of example, Kaman sent status reports to R&M in New Mexico each month affirmatively representing that it was "on track" to provide subcomponents, including some directly to R&M at its New Mexico address, pursuant to the parties' purchasing orders. R&M alleges that these monthly status reports contained false statements on which R&M relied in submitting bids for government contracts with "devastating consequences for R&M." Based on these allegations, the Court is satisfied that R&M has shown purposeful direction under the "harmful effects" framework, just as it has under the "continuing relationships" framework. Accordingly, R&M has demonstrated that Kaman purposefully directed its activities at New Mexico. *See XMission, LC*, 105 F.4th at 1310–12 (concluding that the plaintiff satisfied the "harmful effects" test and demonstrated purposeful direction at Utah by showing that the out-of-state defendant sent emails to customers in Utah with constructive knowledge that the customers were in Utah and with knowledge that the brunt of any injuries therefrom would be felt in Utah); *Dudnikov*, 514 F.3d at 1071 (applying the "harmful effects" test to determine that because the defendant's express aim was to halt a Colorado-based eBay auction by a Colorado resident, and because the harm was felt by the plaintiff in Colorado, the defendant purposefully directed its actions at Colorado, even though it sent its communications to eBay in California).

Beyond Kaman's general position that the focal point of R&M's tort claims is Florida and its conclusory statement that "R&M has not alleged—and cannot show—that . . . [its] injuries arise from Kaman's New Mexico-related activities" [ECF 10 at 12], Kaman does not otherwise dispute

that R&M's alleged injuries arose out of forum-related activities. R&M, on the other hand, has sufficiently alleged that its injuries (i.e., "devastating consequences" arising from the cancellation of the Air Force Contracts for default) arose out of Kaman's "forum-related activities"—namely, Kaman's solicitation of a commercial relationship with R&M and its misrepresentations throughout that relationship. Accordingly, the Court concludes that R&M has satisfied both prongs of its "light" burden, *see Wenz*, 55 F.3d at 1505, to make a "prima facie showing of personal jurisdiction" over Kaman. *Eighteen Seventy,* 32 F.4th at 964. In other words, R&M has put forth "uncontested allegations" that "if true would support jurisdiction over [Kaman]." *Id.*

        ii.   <u>Fair Play and Substantial Justice</u>

Although the Court has found sufficient "minimum contacts" between Kaman and New Mexico, the personal jurisdiction inquiry does not end there. The Court must also consider whether the exercise of personal jurisdiction over Kaman in New Mexico "offends 'traditional notions of fair play and substantial justice.'" *Eighteen Seventy*, 32 F.4th at 966. Put another way, the Court must consider whether the "exercise of personal jurisdiction over [Kaman] . . . is 'reasonable' in light of the circumstances surrounding the case." *Benton*, 375 F.3d at 1078 (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

Notably, the "minimum contacts" and reasonableness analyses are complementary, such that the weaker a plaintiff's showing on "minimum contacts," the less the out-of-state must show in terms of unreasonableness to defeat jurisdiction. *See id.* at 1078–79. Conversely, a strong showing of reasonableness "may serve to fortify a borderline showing of" minimum contacts. *OMI*, 149 F.3d at 1092 (quoting *Ticketmaster—New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)). Here, the Court characterizes R&M's "minimum contacts" showing as reasonably strong. That is, although there were two facts that could cut against a finding of purposeful direction, when

considering the facts in the aggregate, the Court did not consider the question a particularly close call.  Bearing this in mind, the Court considers each of the reasonableness factors:

> (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies.

*Dental Dynamics, LLC*, 946 F.3d at 1229.

Apart from asserting that litigating in New Mexico would be a logistical and financial burden, Kaman has not persuasively explained how any of the five applicable factors make the exercise of personal jurisdiction over Kaman in New Mexico unfair or unreasonable. Instead, Kaman's arguments amount to complaints of inconvenience. But inconvenience is not something unique to this case. Moreover, because the parties operate their businesses in two different states, the selection of a venue for their disputes will necessarily inconvenience one party. Here, R&M won the race to the courthouse and filed its complaint in New Mexico, leaving Kaman to bear the brunt of inconvenience as to forum. However, that inconvenience alone does not transform this into a "rare" case where the exercise of personal jurisdiction is unreasonable despite a strong "minimum contacts" showing. *See Compañía de Inversions Mercantiles, S.A.*, 970 F.3d at 1289 (explaining that instances where application of the applicable factors render unreasonable an otherwise valid exercise of personal jurisdiction are rare).

Given Kaman's more-than-three-year commercial relationship with a New Mexico company and the harm R&M alleges it suffered in New Mexico as a result of that relationship, there is little question that New Mexico has an interest in providing a local forum for R&M to seek redress. *See AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1062 (10th Cir. 2008) ("States have an important interest in providing a forum in which their residents can seek redress

for injuries caused by out-of-state actors."). Kaman suggests that New Mexico's interest is "offset" or "watered down" by the parties' incorporation of a Florida choice-of-law provision into their contracts. *See* ECFs 10 at 14; 26 at 8. But Kaman overstates the significance of the choice-of-law provision to the Court's analysis here. Based on the present record, that provision applies only to the *contractual* disputes between the parties. And R&M's claims, save one, sound in tort. Although Kaman suggests that it will eventually assert breach-of-contract counterclaims that will be governed by Florida law, the Court declines to assess the fairness of exercising personal jurisdiction over Kaman based on claims that could potentially be asserted in the future. Finally, this Court is accustomed to applying the law of other states in diversity actions, and the fact that it may be required to do so with respect to claims in this case does not render the exercise of personal jurisdiction over Kaman unreasonable. *See Res. Assocs.*, 193 F. Supp. 3d at 1245.

Kaman also contends that litigating in New Mexico is inconvenient from a discovery perspective. *See* ECFs 26 at 9; 32 at 8. Because Kaman's manufacturing facility and some physical evidence associated with the status of its manufacturing efforts are situated in Florida, Kaman argues that it is problematic for the parties to conduct discovery "through New Mexico." ECFs 26 at 9; 32 at 8. These discovery-related arguments are not compelling, however. In the Court's view, discovery will not be substantially affected by the venue in which the case proceeds. While it is true that some witnesses and evidence in this case are located in Florida, it is equally true that some witnesses and evidence are located in New Mexico. In the modern litigation environment, discovery-related inconvenience can be addressed in various ways, including putting documents in electronic form and using affidavits and photos to capture the status quo of physical evidence. *See Burger King*, 471 U.S. at 474. Moreover, depositions are typically taken either virtually or where a witness resides, such that the Court does not foresee Florida witnesses needing to travel

to New Mexico during the discovery phase of this case. *See id.*

At oral argument, Kaman identified travel to New Mexico for hearings and trial as the "principal burden" resulting from this Court's exercise of personal jurisdiction over it. ECF 32 at 8. As the hearing on this motion demonstrated, the Court's practice of conducting remote hearings when out-of-state participants are involved certainly minimizes those burdens. *See* ECF 32 at 8. Moreover, the Court is not convinced that Kaman's participation in a trial in New Mexico will be unduly burdensome to Kaman, particularly given that it is a U.S.-based, "large and sophisticated aerospace manufacturer." *See* Compl. ¶¶ 1, 13. Ultimately, the Court does not perceive any unique features of this case that would counsel against permitting a dispute between Kaman and a company with whom it engaged in a lengthy commercial relationship to be litigated in that company's home state.

### b. Economic Loss Rule

Next, Kaman argues that New Mexico's economic loss rule bars R&M's negligent misrepresentation and constructive fraud claims and that those claims should therefore be dismissed for failure to state a claim. ECF 10 at 16. As a general matter, the economic loss rule operates to "prevent[] plaintiffs 'from recovering in tort economic losses to which their entitlement flows only from a contract.'" *U.S. ex rel. Custom Grading, Inc. v. Great Am. Insur. Co.*, 952 F. Supp. 2d 1259, 1269 (D.NM. 2013).

The parties agree that the New Mexico appellate courts have not squarely applied the economic loss rule outside the products liability context. ECFs 16 at 18; 26 at 9. Yet, they observe that judges in this District have offered *Erie* predictions as to whether New Mexico courts would extend the doctrine to other contexts. Kaman, for instance, relies on a fifteen-year-old case in which Judge Torgerson of this District applied the economic loss rule to bar negligent

misrepresentation and fraud claims in a commercial contract case involving a non-compete clause. ECF 10 at 17–18 (discussing *Kachina Rentals, LLC v. Mobile Storage Group, Inc*., No. 09-173 ACT/WDS, 2009 WL 10666359 (D.N.M. July 6, 2009)). R&M, on the other hand, characterizes this District's treatment of the doctrine as "conflicting." ECF 16 at 19 (contrasting *Farmers Alliance Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1174 (D.N.M. 2006), in which Judge Lynch held that New Mexico courts would apply the rule to service contracts, to *Bhandari v. VHA Sw. Comm. Health Corp*., No. Civ. 09-0932 JB/GBW, 2011 WL 1336515, at *24 (D.N.M. Mar. 30, 2011), in which Judge Browning concluded otherwise). The New Mexico Court of Appeals has acknowledged that judges in this District have concluded that the New Mexico courts would extend the economic loss rule to service contracts, but it cautioned that "neither [it] nor the New Mexico Supreme Court has extended application of the economic loss rule in such a manner." *NM-Emerald, LLC v. Interstate Dev., LLC*, 488 P.3d 707, 711 n.3 (N.M. Ct. App. 2021).[11]

Another factor further muddies application of the doctrine here. That is, the economic loss rule "applies only 'in commercial transactions, when there is no great disparity in bargaining power of the parties.'" *U.S. ex rel. Custom Grading, Inc.*, 952 F. Supp. 2d at 1269 (quoting *Utah Int'l Inc. v. Caterpillar Tractor Co*., 775 P.2d 741, 744 (N.M. Ct. App. 1989)). Kaman argues that "R&M does not (and cannot) allege that there was a great disparity in bargaining power between R&M and Kaman" [ECF 10 at 17 n.7], but R&M insists that "[t]here *is* a substantial disparity in bargaining power between the parties" [ECF 16 at 21]. Setting aside these arguments of counsel, the allegations before the Court are that "Kaman is a large and sophisticated aerospace

---

[11] In *NM-Emerald*, the New Mexico Court of Appeals declined to reach the issue of the economic loss rule's extension to construction defect claims absent briefing by the parties. 488 P.3d at 711. More recently, in March of 2023, the New Mexico Court of Appeals once again explained that "[t]o date, New Mexico courts have only applied the doctrine in cases involving products liability." *Gutierrez v. Padilla*, No. A-1-CA-39286, 2023 WL 2674395, at *5 (N.M. Ct. App. Mar. 29, 2023) (declining to reach the issue of application of the economic loss rule because it was not preserved below).

manufacturer," that "R&M is very inexperienced in manufacturing and assembly work," but that "both parties brought unique skillsets to the table" when they decided to work together to bid for government contracts. Compl. ¶¶ 1, 3, 22. The Complaint further alleges that Kaman "presented R&M with" the MOU and promised to serve as a "mentor and guide" to R&M with respect to the manufacturing process. *Id.* ¶¶ 16, 22. Although these allegations may relate more to the parties' relative size and experience than directly to their bargaining power, they give the Court pause when considering application of the economic loss rule to bar R&M's tort claims. Logically speaking, Kaman's size and sophistication may have translated to greater bargaining power in its commercial dealings with R&M. But most notably, Kaman asserted application of the economic loss doctrine in the context of its Motion to Dismiss, and the parties have not yet had the opportunity to explore through discovery facts related to the parties' negotiations or the formation of their contracts.[12]

For these reasons, the Court concludes that the facts are presently unsettled as they relate to the relative bargaining power between R&M and Kaman. Based on the evidence and allegations before it, the Court is unable to adequately assess the even-handedness of the parties' dealings. Because application of the economic loss doctrine is premised on there being no great disparity in the parties' bargaining power, the Court cannot say that the doctrine would bar R&M's tort claims here, even if it were extended to the current context. Thus, to the extent Kaman asks the Court to apply the economic loss doctrine and to dismiss R&M's claims for misrepresentation and constructive fraud, the Court denies the motion without prejudice to Kaman reasserting those

---

[12] The supplemental briefs filed by the parties at the Court's invitation hint at potential disparities in bargaining power during the negotiation of the terms of their MOU and purchase orders. *See* ECFs 30; 31. R&M represents that Kaman did not provide to R&M the terms and conditions that were purportedly incorporated therein, despite R&M's request that it do so. ECF 30 at 1. Although the validity, scope, and proper incorporation of the terms and conditions are issues not ripe for decision without an evidentiary hearing, the parties' disputes on this front at least give rise to the possibility that uneven bargaining power was at play in the formation of the parties' contracts. This possibility further weighs against using the economic loss doctrine to bar R&M's tort claims at least at this stage of the proceedings.

arguments at the summary judgment stage after further factual development.

### c.  Compliance with Federal Rule of Civil Procedure 9(b)

Kaman asserts that R&M did not plead its constructive fraud claim with sufficient particularity under Federal Rule of Civil Procedure 9(b) and, consequently, Count II of the Complaint should be dismissed for failure to state a claim. ECF 10 at 20–26. Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Tenth Circuit has interpreted this rule to require that "at a minimum . . . a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud" as well as "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *U.S. ex rel. Lacy v. New Horizons, Inc*., 348 F. App'x 421 (10th Cir. 2009) (citations omitted). The purpose of Rule 9(b) is to "afford [the] defendant fair notice of the plaintiff's claim and [its] factual ground" and to "safeguard[ the] defendant's reputation and goodwill from improvident charges of wrongdoing" *Farlow v. Peat, Marwick, Mitchell & Co*., 956 F.2d 982 (10th Cir. 1992).

R&M's constructive fraud claims rest on alleged misrepresentations as to Kaman's capability and desire to manufacture, tool, or purchase subcomponents; its leasing of space at the Jacksonville facility; its provision of free assembly expertise to R&M; and its progress on various purchase orders. Compl. ¶ 175. Kaman insists that R&M does not plead any of these categories of misrepresentations with sufficient particularity. ECF 10 at 20–26. In response, R&M maintains that its Complaint "contains several detailed allegations of the many fraudulent statements made by Kaman during its relationship with R&M." ECF 16 at 23. R&M points to its allegations that Kaman claimed to have the capability and desire to manufacture products called for by the purchase orders, that it would lease facility space, and that its progress on the purchase orders was

"on track." *Id*. (citing Compl. ¶¶ 7, 21–22, 29–40, 48–53, 75–77, 86–87, 99–101, 110–12, 121–23, 133). R&M represents that "[o]ften, the Complaint identifies the specific speaker that made the misrepresentation, directly quotes the statement, or provides the general timeframe that it was made." *Id*. (citing Compl. ¶¶ 18–22, 29–40, 48–53, 75–55[sic]).

      With respect to the first category of alleged misrepresentations, Kaman argues that R&M offers little more than a conclusory allegation that "Kaman promised R&M that . . . [it] had the capacity and desire to manufacture, tool, and purchase subcomponents necessary to ensure that R&M could fulfil [sic] [its] prime contract obligations." ECF 10 at 21 (quoting Compl. ¶ 4). Although the Complaint discusses Kaman's underperformance on the purchase orders [*see* Compl. ¶¶ 61–130] and appears to infer therefrom that Kaman must have "egregiously misrepresented its willingness and ability to serve as subcontractor" [*id*. ¶ 9], the Complaint stops short of recounting or paraphrasing any specific statement about Kaman's capacity or desire to perform its obligations. Nor does the Complaint specify who made the offending statement, when, or where it was made. As such, these allegations do not provide sufficient particularity under Rule 9(b), and they likewise fail to provide Kaman the information necessary to respond to this claim.

      As to the second category of alleged misrepresentations (*i.e.*, misrepresentations related to R&M's lease of Kaman's space in Jacksonville and the provision of free assembly expertise), Kaman once again insists that the Complaint fails to provide "the sort of factual allegations needed to meet the particularity standard of Rule 9(b)." ECF 10 at 21. In response, R&M offers a string citation to numerous paragraphs of its Complaint. *See* ECF 16 at 23. Some of the referenced paragraphs correspond to allegations about the contemplated Jacksonville lease and Kaman's offer of free assembly expertise. For instance, R&M alleges that "Kaman assured R&M that it would assist R&M in the assembly process, for free" and that the parties agreed, based on their "new

understanding," that it would be "mutually beneficial for R&M to rent an office space inside Kaman's Jacksonville facility." Compl. ¶¶ 29–30. While these allegations do a better job of identifying the content of the representations at issue, they still fail to specify who made them and where and when they were made. Likewise, R&M alleges that it "had been promised that it would be occupying Kaman's Jacksonville facility in the fall of 2022" [*id.* ¶ 37], but that allegation, too, fails to identify the "who," where", or "when." Although R&M attempts to identify, in collective fashion, various individuals who allegedly made false statements, some by name and some by category, it does not tie the individuals to the statements purportedly made with respect to the Jacksonville lease or the provision of assembly expertise. *See* ECF 16 at 23. Nor has R&M sufficiently narrowed the timeframe during which these allegations were made. R&M asserts that it has sufficiently alleged the "when" for Kaman's misrepresentations by alleging that its "fraudulent conduct spanned from October 1, 2020, through at least September 14, 2023." *Id.* at 24. Under the circumstances here, a three-year window spanning the entirety of R&M and Kaman's relationship, during which there were dozens, if not hundreds, of communications related to R&M leasing space in Jacksonville, does not provide the specificity to which Kaman is entitled. As to the "where," R&M contends that the misrepresentations were made "to R&M personnel in New Mexico." *Id.* (citing Compl. ¶¶ 48, 75, 86). Neither counsel's representations nor the paragraphs of the Complaint referenced provide any insight as to where Kaman made these alleged misrepresentations related to the Jacksonville lease.

Also relevant to lease-related misrepresentations, R&M alleges certain conduct by Kaman that suggests Kaman planned to lease space to R&M, including providing a draft lease [Compl. ¶ 31], showing R&M executives portions of its facility branded with R&M signage [*id.* ¶ 33], and submitting a declaration to the Small Business Administration that mentioned a plan to enter into

a lease with R&M [*id*. ¶ 39]. But none of those allegations identify specific statements or promises that Kaman would lease space to R&M. Although it is a closer call for this category of misrepresentations, the Court concludes that without identifying the "who" and the "when," R&M's allegations fall short of Rule 9(b)'s standard.

As to the final constructive fraud theory (*i.e.*, that Kaman failed to "accurate[ly] reflect its progress" on purchase orders), R&M alleges that Kaman assured it during monthly updates and virtual meetings that its work was proceeding on time as to five different purchase orders. *See id*. ¶¶ 75, 77, 86, 87, 99, 101, 110, 112, 121, 123, 144. In addition, R&M attaches to its Complaint Kaman's "Project Status as of 9/14/2023" [*see* Compl. Ex. E] and provides specific examples of Kaman's statements therein: (1) for purchase order 20803, that "Kaman informed R&M that Kaman had 'received 8 used door assemblies and began reverse engineering" and that "Kaman was 'expecting tooling from the Air Force'" [Compl. ¶ 76]; (2) for purchase order 20865, that "Kaman informed R&M that '[m]ost non-recurring engineering had been performed,' including the creation of 'bond tooling design,' 'detail tool design' and other engineering" [*id*. ¶ 100]; and (3) for purchase order 20875, that "Kaman informed R&M that '[m]ost non-recurring engineering has been performed, including the creation of 'bond tooling design,' 'detail tool design' and other engineering" and that Kaman "claimed that it had purchased some raw materials and subcomponents" [*id*. ¶ 111].

To be sure, these specific statements are pled with particularity. But as Kaman points out, the identified statements do not appear to be the misrepresentations on which R&M's constructive fraud theory logically rests. Whereas R&M alleges that Kaman's misrepresentations about the status of work on the purchase orders contributed to the Air Force Contracts being terminated [*see id*. ¶ 10, 168], the September 14, 2023 status report from which R&M derives its sample

misrepresentations is dated *after* R&M was found to be ineligible to perform the Air Force Contracts it was awarded. *Compare id*. ¶¶ 10, 168, *with id*. ¶¶ 148, 149; Ex. L, M. Moreover, the September 14, 2023 status report indicates that the programs were "on constructive work hold." Compl., Ex. E, at 1–2. Relatedly, Rule 9(b) requires identification of the consequences of any alleged misrepresentations, *see Heavy Petroleum Partners, LLC v. Atkins*, 457 F. App'x 735, 742–43 (10th Cir. 2012), which the Complaint fails to articulate or infer given the timing of those statements in relation to the ineligibility determination. In response, R&M argues that by identifying specific statements in the September 14, 2023 status report, its Complaint "put Kaman on notice of the *other* fraudulent correspondences." ECF 16 at 24 (emphasis added). The Court is unpersuaded that by specifying statements other than those on which its constructive fraud theory rests, R&M has provided the specificity required for this claim. At minimum, Rule 9(b) requires that R&M specify what about Kaman's status reports R&M considers fraudulent. Although R&M points to Mr. Archetti's Declaration to supply additional specificity under this constructive fraud theory, the Court is not convinced that consideration of allegations or evidence outside of the Complaint is proper under Rule 12(b)(6).[13] As with the other constructive fraud theories discussed above, the Court concludes that R&M allegations fail to satisfy Rule 9(b).

As a whole, the allegations supporting R&M's constructive fraud claims, though certainly voluminous, fail to satisfy Rule 9(b). R&M has represented that, if necessary, it can provide additional specificity as to these claims, including the misrepresentations documented in e-mails

---

[13] Kaman maintains that the Court should consider only the allegations of R&M's Complaint when assessing its compliance with Rule 9(b). ECFs 26 at 11–12; 32 at 11. R&M, in contrast, urges the Court to consider Mr. Archetti's Declaration for these purposes [*see* ECF 32 at 15], and it cites one in-circuit case for the proposition that specificity under Rule 9(b) can be provided by "'alternative' means," such as through "fraudulent documents" and "affidavits." ECF 16 at 23 (citing *Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1253 (10th Cir. 1997)). The Court does not read *Schwartz* the same way that R&M does. *Schwartz* says nothing of a court's consideration of affidavits under Rule 9(b). And while the Tenth Circuit explained that the complaint at issue in *Schwartz* identified documents that contained allegedly fraudulent statements, it also observed that the complaint itself "describe[d] the statements with particularity and even quote[d] them in most instances." *Id*. at 1252.

or status reports and descriptions of misrepresentations made in oral conversations. ECF 32 at 15. As such, it does not appear that permitting R&M to amend would be futile. Accordingly, the Court will dismiss the constructive fraud claim without prejudice but, consistent with R&M's request [*see* ECF 16 at 24], will permit R&M an opportunity to amend its Complaint to provide additional specificity for its constructive fraud claim in accordance with Rule 9(b).

## V.    CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion to Dismiss is **[ECF 10] is GRANTED IN PART AND DENIED IN PART** as follows:

(1) To the extent Kaman seeks dismissal of R&M's claims on the basis that the Court lacks personal jurisdiction over Kaman, the Motion is **DENIED**.

(2) To the extent Kaman seeks dismissal of R&M's negligent misrepresentation and constructive fraud claims by operation of the economic loss rule, the Motion is **DENIED WITHOUT PREJUDICE** to Kaman raising its arguments at the summary judgment stage.

(3) To the extent Kaman asserts that R&M's constructive fraud claim fails to satisfy Federal Rule of Civil Procedure 9(b), the Motion is **GRANTED** and Count II is **DISMISSED WITHOUT PREJUDICE** with leave to amend.

**IT IS FURTHER ORDERED** that R&M may amend its Complaint to provide additional specificity for its constructive fraud claim by October 18, 2024.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***